IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| EDWARD MICHAEL THOMPSON<br><br>Plaintiff,<br><br>v.<br><br>CITY OF COEUR D'ALENE POLICE CHIEF WAYNE LONGO, et al.,<br><br>Defendants. | Case No. 2:09-cv-00434-BLW<br><br>**MEMORANDUM DECISION AND ORDER** |

## INTRODUCTION

Before the Court is the defendants' motion for summary judgment. The Court heard oral argument on October 5, 2010, and took the motion under advisement. For the reasons explained below, the Court will grant the motion on the malicious prosecution and false imprisonment/wrongful incarceration claims, and deny the motion on the false arrest and excessive force claims

## FACTUAL BACKGROUND

On June 15, 2008, Officers Bangs and Lowry responded to a report of an aggravated assault. *See Bangs Affidavit, Dkt. 19-4* at ¶ 1. The dispatch officer told

**Memorandum Decision & Order – page 1**

the officers that the suspect, plaintiff Thompson, "was known to carry a gun." *See Harris Affidavit, Dkt. 19-5,* at ¶ 8.

The alleged victim, Zachary Boerner, told the officers that Thompson, his roommate, threatened him with a knife in the kitchen of their shared residence. *Bangs Affidavit, supra,* at ¶ 9. Boerner explained that he and Thompson had been arguing about Boerner moving out of the shared residence. *Id*. at ¶ 11. Boerner told Officer Banks that during the argument, Thompson grabbed a silver knife off the counter, pointed the knife at Boerner, and told him that "he would use it on him" if Boerner gave Thompson "any problems about moving out." *Id*. at ¶ 11. Boerner stated that "he was in fear for his life and that he [Boerner] thought that [Thompson] was going to stab or cut him with the knife." *Id*. at ¶ 12.

Officer Lowry called Thompson, recounted Boerner's allegations, and told Thompson that the officers needed to talk to him in person to hear his side of the story. *Lowry Affidavit, Dkt. 19-3* at ¶¶ 9-10. Officer Lowry recalls that Thompson explained over the telephone that "his roommate was being aggressive towards him and that he wanted him out of the house." *Id*. at 11.

Thompson recalls that Officer Lowry said he needed to talk to Thompson but that "they weren't going to arrest me." *See Thompson Deposition, Dkt. 19-7* at

**Memorandum Decision & Order – page 2**

32. *Id*. According to Thompson, Officer Bangs "kept trying to find out where I was at that – he's like, Where are you right now? Where are you right now?" *Id*. at 33. Thompson says he told Officer Lowry that "I was in transit to my house, and I'd be there in less than a half hour." *Id*.

Officer Lowry's recollection is different. According to Officer Lowry, Thompson stated that (1) he was waiting for his dad to get out of church; (2) he would call the police in 30 minutes to make arrangements to meet them, and (3) he might be able to meet them in the Denny's parking lot. *Lowry Affidavit, supra*, at ¶ 13-15. Thompson recalls that as Officer Lowry got persistent in asking about Thompson's location, Thompson hung up on him. *Thompson Deposition, supra,* at 33

At any rate, Officer Lowry decided to stake out Thompson's house. *Id*. at ¶ 22. About 38 minutes after talking with Thompson, Officer Lowry saw Thompson arrive at his residence. *Id*. at ¶ 23.

Thompson and his girlfriend sat on the grass outside the house and waited for the police to arrive. *Thompson Deposition, supra*, at 34. Thompson was shirtless and wearing a pair of shorts and flip flops. *Thompson Affidavit, Dkt. 24-1* at ¶ 13. Within a few minutes, the police arrived, and Thompson recalls what

happened next:

> Twelve officers in full riot gear rushed us and ordered me to get up. After I complied, they dragged me to the center of my yard and threw me face down onto my concrete sidewalk. I repeatedly stated that I was not resisting and would cooperate because they all had their weapons trained on my chest and I was in fear of my life. These weapons included mace, tasers, and hand guns. . . . One officer stated that he would love to mace me, while his knee was on my neck and after he had handcuffed me. I suffered bruises and lacerations to my face from being violently thrown down. Furthermore, the officer who handcuffed me placed the handcuffs on way too tightly and jerked my hands behind my back, causing me excruciating pain and soreness in my arms and shoulders, which lasted for weeks. I asked the officer several times to loosen the handcuffs, but he refused and in fact tightened them more after I complained that they were hurting me.

*See Thompson Affidavit, supra*, at ¶ 14.

Thompson's account is not rebutted by the officers in their affidavits. Officer Bangs does add that after he handcuffed plaintiff, he "noticed a silver folding pocket knife clipped onto the right side of [Thompson's] shorts. I took the knife from [Thompson] for safety reasons." *See Bangs Affidavit* at ¶¶ 19-20.

The police arrested Thompson and charged him with a felony, aggravated assault under Idaho Code § 18-901, and two misdemeanors for exhibiting a deadly weapon under Idaho Code § 19-2520, and delay and obstructing an officer under Idaho Code § 18-705. Thompson spent three days in the Kootenai County Jail

**Memorandum Decision & Order – page 4**

until he posted a non-refundable $2500 bail bond. *See Complaint, Dkt 1* at ¶ 5. Later, in 2008, all the charges were dismissed.

Thompson filed this lawsuit under 42 U.S.C. § 1983 against the City of Coeur d'Alene, Police Chief Wayne Longo, and officers Bangs, Ayers, Lowry, Harris and Dixon. Thompson's complaint contains claims that (1) his arrest was not supported by probable cause, (2) the officers used excessive force in making the arrest, and (3) he was subjected to malicious prosecution and false imprisonment.

## STANDARD OF REVIEW

One of the principal purposes of the summary judgment "is to isolate and dispose of factually unsupported claims . . . ." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24 (1986). It is "not a disfavored procedural shortcut," but is instead the "principal tool[ ] by which factually insufficient claims or defenses [can] be isolated and prevented from going to trial with the attendant unwarranted consumption of public and private resources." *Id*. at 327. "[T]he mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242,

**Memorandum Decision & Order – page 5**

247-48 (1986).

The moving party bears the initial burden of demonstrating the absence of a genuine issue of material fact. *Devereaux v. Abbey*, 263 F.3d 1070, 1076 (9th Cir. 2001)(en banc). To carry this burden, the moving party need not introduce any affirmative evidence (such as affidavits or deposition excerpts) but may simply point out the absence of evidence to support the nonmoving party's case. *Fairbank v. Wunderman Cato Johnson,* 212 F.3d 528, 532 (9th Cir.2000).

This shifts the burden to the non-moving party to produce evidence sufficient to support a jury verdict in her favor. *Liberty* Lobby, 477 U.S. at 256-57. The non-moving party must go beyond the pleadings and show "by her affidavits, or by the depositions, answers to interrogatories, or admissions on file" that a genuine issue of material fact exists. *Celotex,* 477 U.S. at 324.

The evidence must be viewed in the light most favorable to the non-moving party, *id.* at 255, and the Court must not make credibility findings. *Id.* Direct testimony of the non-movant must be believed, however implausible. *Leslie v. Grupo ICA*, 198 F.3d 1152, 1159 (9th Cir. 1999). On the other hand, the Court is not required to adopt unreasonable inferences from circumstantial evidence. *McLaughlin v. Liu*, 849 F.2d 1205, 1208 (9th Cir. 1988). And a court is not

obligated to take the non-movant's version of events as true when the account is blatantly contradicted by video evidence. *Scott v. Harris,* 550 U.S. 372, 378-81 (2007).

To establish a prima facie case under 42 U.S.C. § 1983, a plaintiff must demonstrate that (1) the action complained of occurred under color of state law, and (2) the action resulted in a deprivation of a constitutional right or a federal statutory right. *McDade v. West*, 223 F.3d 1135, 1139 (9th Cir. 2000). There is no dispute that defendants acted under color of state law. The only dispute is whether there are questions of fact on the alleged constitutional violations.

## ANALYSIS

### Arrest – Probable Cause

Thompson's complaint alleges that he was arrested without probable cause. Thompson alleges that the officers had a duty to investigate Boerner, and that if they did, they would have discovered that he "had just been released from a mental hospital, unlawfully entered [Thompson's] home without permission, and challenged [Thompson] to a fight in [Thompson's] own home." *See Pft's Brief* at 3.

There is probable cause for a warrantless arrest if, under the totality of the

facts and circumstances known to the arresting officer, a prudent person would have concluded that there was a fair probability that the suspect had committed a crime. *U.S. v. Struckman*, 603 F.3d 731 (9th Cir. 2010). Probable cause demands "factual specificity," and must be judged according to an objective standard, taking into account "the nature and trustworthiness of the evidence of criminal conduct available to the police." *Id.* at 739. Because the standard is an objective one, the arresting officer's subjective intention in exercising his discretion to arrest is immaterial in judging whether his actions were reasonable for Fourth Amendment purposes." *Id*. at 740.

The Court will turn first to whether defendants are entitled to a ruling, as a matter of law, that the officers had probable cause to arrest Thompson for aggravated assault. Victims who report crime are "presumed to be reliable." *U.S. v. Henderson*, 721 F.2d 662, 665 n. 1 (9th Cir. 1983). "A detailed eye-witness report of a crime is self-corroborating; it supplies its own indicia of reliability." *See U.S. v. Estrada*, 733 F.2d 683, 686 (9th Cir. 1984).

At the same time, "[i]n establishing probable cause, officers may not solely rely on the claim of a citizen witness that he was a victim of a crime, but must independently investigate the basis of the witness' knowledge or interview other

**Memorandum Decision & Order – page 8**

witnesses." *See Hopkins v. Bonvicino*, 573 F.3d 752, 767 (9th Cir. 2009). In that case, the police heard allegations from eye-witness Talib that (1) plaintiff Hopkins had just caused a minor collision with Talib's car, (3) his breath smelled of alcohol, (4) he appeared intoxicated, and (5) he had run into a nearby house. On that basis, the police entered Hopkins' house to arrest him. The Circuit noted that the police failed to interview anyone else and did nothing to corroborate Talib's account. For example, Talib said the accident had just occurred, but the police failed to inspect Hopkin's car to see if the engine was warm or if there was evidence of alcohol use in the car. *Id.* at 767. The Circuit described Talib's allegations as "cursory and conclusory," and concluded that "these statements from a witness, without further investigation by the police, are insufficient to support probable cause." *Id*.

The Court does not read this authority as requiring the police to do an independent investigation in every instance. Each case must be reviewed on its facts. The ultimate inquiry is whether "a prudent person would have concluded that there was a fair probability that the suspect had committed a crime." *Struckman*, 603 F.3d at 739.

Comparing this case to *Hopkins*, it appears that Officers Lowry and Bangs obtained more information from Boerner than the police obtained from the victim

**Memorandum Decision & Order – page 9**

in *Hopkins*. On the other hand, the record does not reveal that the officers did anything to check Boerner's veracity. Most importantly, there is no evidence that the officers checked with the only other eyewitness to the incident – Thompson – to get his side of the story.[1] There is no indication in the record that time was of the essence.

Reading between the lines, the officers appeared to have a great deal of prior experience with Thompson, and he concedes being "well known" to the officers. After all, Officer Lowry had Thompson's cell phone number. And Thompson was obviously not some "Mayberry" stumblebum – as discussed above, he was "known to carry a gun." *See Harris Affidavit*, *Dkt. 19-5*, at ¶ 8. The defense has placed in the record Thompson's criminal history. *See Williams Affidavit, Dkt. 19-7.* And the officers may have known of Thompson's behavior in addition to his formal criminal history that also informed their actions.

But the record is completely silent on what the officers actually knew about

---

[1] There is a brief mention by Officer Lowry that prior to the arrest, Thompson told him on the telephone that "his roommate was being aggressive towards him and that he wanted him out of the house." *See Lowry Affidavit* at ¶ 11. That implies that Officer Lowry may have asked for Thompson's account of the incident, but there is no express testimony from the officers that they ever did so, and Thompson's account contains no opportunity for him to address Boerner's charges.

**Memorandum Decision & Order – page 10**

Thompson's formal and informal criminal history at the time of his arrest. The officers' affidavits simply fail to discuss this subject. Their actual knowledge is a key fact under *Stuckman*: Probable cause depends on what a prudent officer would do *with the knowledge of the arresting officers*. *Struckman*, 603 F.3d at 739.

This record would compel the Court to assume or infer what the officers knew at the time of the arrest about Thompson's past criminal history and past behavior in general. However, the Court is precluded by the authorities cited above from making assumptions or inferences in favor of the moving party in a summary judgment proceeding.

Under *Struckman*, a key fact is the knowledge the police had at the time of the arrest. This record raises questions on that key fact that preclude summary judgment.

Similar questions exist with respect to the other charges. For example, on the obstruction charge, the officers' account has the defendant misleading them about his location and plans. However, if the plaintiff is to be believed, he told the officers he would meet with them at his house in about 30 minutes, and according to the officers' own account, Thompson arrived there in 38 minutes. The Court cannot judge credibility at the summary judgment stage, and hence will deny summary judgment on the arrest issues.

**Memorandum Decision & Order – page 11**

**Excessive Force**

Allegations of excessive force are examined under the Fourth Amendment's prohibition on unreasonable seizures. *See Graham v. Connor*, 490 U.S. 386, 394 (1989). The Court must ask "whether the officers' actions are objectively reasonable in light of the facts and circumstances confronting them." *Id*. at 397. The Court must balance "the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake." *Id.* at 396. Stated another way, the Court must "balance the amount of force applied against the need for that force." *Bryan v. MacPherson*, 608 F.3d 614 (9th Cir. 2010) (quoting *Meredith v. Erath*, 342 F.3d 1057, 1061 (9th Cir.2003)).

At oral argument, defense counsel stated that Thompson has merely alleged being taken to the ground and handcuffed. However, as discussed above, he alleges more than this – he alleges that he suffered "bruises and lacerations" and suffered "excruciating pain and soreness in my arms and shoulders, which lasted for weeks." *See Thompson Declaration, supra*, at ¶ 14. He describes being "violently thrown down" and alleges that one officer had "his knee . . . on my neck."

Having identified the amount of force, the Court must next examine the need for that force, which depends on three core factors: (1) the severity of the crime at

issue, (2) whether the suspect poses an immediate threat to the safety of the officers or others, and (3) whether he is actively resisting arrest or attempting to evade arrest by flight. *Graham*, 490 U.S. at 396. There is no evidence that Thompson was resisting or attempting to evade arrest – his own unrebutted account states that he was fully cooperating with the officers. On the other hand, he had a knife clipped to his pants, and was known to carry a gun, all factors that would warrant forceful action by the police to control the suspect. But at least with regard to the knife, it appears to have been discovered after the alleged excessive force was applied, and so played no role in the force applied.

These factors are not so clearly weighted in favor of the officers that they require a finding as a matter of law that no excessive force was used. Accordingly, the Court will deny the motion on this issue.

## **Malicious Prosecution and False Imprisonment**

The defendants moved for summary judgment on the malicious prosecution and false imprisonment claims. Malicious prosecution requires plaintiff to prove, among other things, that the prosecution was motivated by malice. *See Shannahan v. Gigray*, 962 P.2d 1048, 1051 (Id.Sup.Ct. 1998). False imprisonment is defined in Idaho Code § 18-2901.

The defendants' motion required, as discussed above, that Thompson

**Memorandum Decision & Order – page 13**

respond with some proof, beyond the complaint allegations, of (1) malice to support his malicious prosecution claim, and (2) the elements of false imprisonment under the Idaho statute. Thompson's responsive brief, and accompanying Declaration, discussed only the arrest and excessive force issues. He completely failed to address the malicious prosecution and false imprisonment claims that had been challenged by defendants. Under the summary judgment standards set forth above, Thompson's failure warrants granting summary judgment on these two issues.

**Qualified Immunity**

"The doctrine of qualified immunity protects government officials from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Pearson v. Callahan*, 129 S.Ct. 808, 815 (2009) (internal quotation marks omitted). A police officer is not entitled to qualified immunity if: (1) the facts show that the officer's conduct violated a plaintiff's constitutional rights; and (2) those rights were clearly established at the time of the alleged violation. *Id.* at 816.

The constitutional rights at issue here, as discussed above, were all well established at the time of the incident at issue. While there are questions of fact

over what happened, the officers are not entitled to qualified immunity if Thompson's account is adopted. Hence, summary judgment is denied on this issue.

## ORDER

In accordance with the Memorandum Decision set forth above,

NOW THEREFORE IT IS HEREBY ORDERED, that the defendants' motion for summary judgment (docket no. 19) is GRANTED IN PART AND DENIED IN PART. It is granted to the extent it seeks summary judgment on plaintiff's malicious prosecution claim and false imprisonment/wrongful incarceration claims. It is denied in all other respects.

DATED: **November 1, 2010**

Honorable B. Lynn Winmill
Chief U. S. District Judge